**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

———————————————————————

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **vs.** | ) |
| | ) |
| **RONALD LAWRENCE SCHUMAN,** | )      **Criminal No. 14-cr-10053-MLW** |
| | ) |
|     **Defendant.** | ) |

——————————————————————— )

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant, Ronald Lawrence Schuman, by and through counsel, hereby submits the following memorandum in an effort to assist this Honorable Court in determining what is a reasonable sentence for Schuman that, following the applicable law, is sufficient but not greater than necessary to achieve the goals of sentencing. After considering the unique facts of this case, Schuman respectfully suggests that a probationary sentence fulfills those requirements. Chief among those considerations include the facts that Schuman voluntarily and affirmatively identified himself to law enforcement once he became aware that he may have been involved in a government sting action; that Schuman was solicited to engage in criminal conduct but there is no evidence that he had any predisposition to commit an illegal act; that Schuman was motivated by the desire to obtain funding for a legitimate business, and he derived no personal financial benefit from the conduct at issue herein; that Schuman has already been sanctioned by the SEC for these identical actions; and that Schuman has led a law-abiding life during which he has consistently been a source of information to law enforcement, including the SEC, regarding violations of securities laws; and that Schuman's wife is gravely ill and if he is incarcerated, his absence will unduly affect her.

## I.    Factual and Procedural Background

Schuman is a 60-year-old husband and father of two who resides in the Southern District of Florida.  He is a founder, and former President and CEO of Connectyx Technologies, Corp., a Florida corporation involved in the development and production of medical technologies, including healthcare-related intelligent software tools.  The Company's key product, MedFlash, enables patients to maintain their personal health and wellness information via the Internet which includes a portable USB flash drive that can be used on any computer with complete privacy, yet affording its users the flexibility of instantaneous access to medical records at any location.

In 2011 Schuman was solicited by Barry Hawk, an attorney and financial advisor, to enter into a funding transaction with "SeaFin," which was described as a New York-based hedge fund with a Massachusetts satellite office.  SeaFin was actually a fictitious entity set up by the FBI as part of a sting operation.  During recorded conversations it was explained to Schuman that SeaFin would purchase stock in Connectyx, and thereafter Connectyx would be required to pay a 50% kick-back to the hedge fund manager, who in reality was an undercover FBI agent.

SeaFin made two purchases of Connectyx stock, for a total of $45,000.  As agreed, Schuman transferred $22,500 to the undercover FBI agent.  Unbeknownst to Schuman, the FBI had ensnared many other small companies in this sting operation and, in or about December 2011 it issued a press release after an arrest in one such case.  Schuman learned of this press release, and realized that the transaction described in it was nearly identical to the one in which he had been involved with SeaFin.  Rather than take steps to conceal his involvement, or even simply wait and hope for the best, Schuman instead affirmatively contacted law enforcement and advised that he believed that he himself had been involved in the FBI's sting operation.  This led

2

to Schuman travelling to Boston to attend a proffer session with the government, followed by extensive debriefings and identification of Schuman as a cooperating government witness.

Schuman ultimately waived indictment and pled guilty to a single-count Information charging him with Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. §§ 1349, 1343. He is scheduled to be sentenced by this Court on December 11, 2015 at 3:00 pm.

## II.    General Legal Principles

Since *United States v. Booker*, 543 U.S. 220 (2005), district courts have been freed from the mechanistic application of guideline ranges and now do something much more difficult than simply impose a sentence within the range.  Courts are now required by the Supreme Court to impose a reasonable sentence that is no greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553.  Indeed, it is now, "emphatically clear that the 'Guidelines are guidelines -- that is, they are truly advisory.'"  *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*); *see also United States v. Saez*, 444 F.3d 15, 17 (1st Cir. 2006) (the guidelines range is the "starting point for analysis").  *Booker* and its progeny have thus restored Article III judges' ability to *decide and fashion* an appropriate sentence, rather than merely impose a sentence already largely decided by the mechanistic application of a strict system of accounting principles.

Instead, the Supreme Court teaches that a sentencing court must make an individualized assessment based on the facts presented in each particular case, assessed in light of the factors and in compliance with the purposes set forth in 18 U.S.C. § 3553(a).  *Gall v. United States*, 552 U.S. 38, 49 (2007); *Booker*, 543 U.S. at 259-60; *United States v. Pelletier*, 469 F.3d 194, 203 (1st Cir. 2006); *United States v. Jiminez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (en banc).

3

Under the "parsimony clause" of section 3553(a), the court is to impose a sentence that is "sufficient, but not greater than necessary to comply with the specific purposes [of the sentencing statute]." 18 U.S.C. § 3553(a). This "parsimony clause" has been cited as an "overarching principle" guiding a judge's sentencing decision. *See United States v. Rodriguez*, 527 F.3d 221, 227 (1st Cir. 2008) (parsimony clause "necessarily informs a sentencing court's consideration of the entire constellation of section 3553(a) factors . . . .")

In the instant case, Schuman requests that the Court vary downward from the guidelines sentence. For the reasons set forth herein, Schuman respectfully urges that a downward variance, to a sentence of probation, is warranted here.

### III.     The Correct Calculation of the Sentencing Guidelines

The beginning point for any federal sentencing is the correct calculation of the sentencing guidelines. *United States v. Saez*, 444 F.3d 15, 17 (1st Cir. 2006). In this case, the PSR correctly sets forth the guidelines calculations with the exception of one issue – the amount of loss attributable to Schuman. Now that the 2015 amendments to the Sentencing Guidelines are effective, proper calculation of the amount of loss actually makes a difference in the guidelines level.

"[L]oss is the greater of actual or intended loss." USSG § 2B1.1, comment. (n.3). The application note defines "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense," and "intended loss" as "the pecuniary harm that was intended to result from the offense." In other words, the relevant "loss" for sentencing purposes is the reasonably foreseeable amount of monetary harm that Schuman caused, or intended to cause, to SeaFin; there is thus a subjective measure to loss. The government bears the burden

4

of proof on the loss amount to be used in the guidelines calculation.  *See United States v. Alli*, 444 F. 3d 34, 38 (1st Cir. 2006).

The First Circuit's decision in *United States v. Prange*, 771 F.3d 17 (1st Cir. 2014) was based on a case that arose from the same FBI sting as the one in which Schuman became ensnared.  There, the sentencing court held the defendants liable for the entire amount of money transferred by the FBI to purchase stock.  However, the First Circuit reversed, holding that the district court should have considered the value of the stock the government received in exchange for the money, and should have reduced the amount of loss by that value.  The same is true for this case.

Here, the government transferred $45,000 to Connectyx, and received 1,100,000 shares of Connectyx stock.  The amount of loss attributable to Schuman, therefore, is $45,000 less the value of the 1,100,000 shares of Connectyx stock.  The parties disagree on the value of those shares.  Based on the market value of Connectyx (trading symbol "CTYX") shares at the time, that value would be between $9,470 and $9,720.  *See* Defendant's objection to PSR ¶ 24, contained in revised PSR.

However, the CTYX shares purchased by SeaFin were restricted shares, and were thus arguably worth less than the market price of free-trading shares.  Although the government argues that the restriction renders these shares essentially worthless, this argument fails.  The First Circuit has made clear that this argument alone simply does not "hold[] water," given that "courts often assign a value to restricted shares."  *United States v. Prange*, 771 F.3d 17, 36 (1st Cir. 2014) (citing *United States v. Roush*, 466 F.3d 380, 385-86 (5th Cir. 2006) ("[T]he fact that the stock was restricted at all times during 1998 did not render its fair market value either zero

5

or de minimus for the purposes of income calculations."); *Scully v. US WATS, Inc.,* 238 F.3d 497, 514 (3d Cir. 2001) (affirming the district court's refusal to discount the value of stock shares simply because they were restricted)).

**A.      Sales of Restricted Connectyx Shares to Others Should Provide the Benchmark Price**

Attached as Exhibit A is a spreadsheet showing sales of *restricted* Connectyx shares to others during late 2011, the time-frame during which the SeaFin transactions occurred.  These transactions reveal that the average share price of restricted CTYX stock at the time was $0.005. Based on this price, the 1,100,000 CTYX shares purchased by SeaFin had a value of $5,500.00. Jon Pevzner, President and CEO of Connectyx, has confirmed that the entries on the spreadsheet accurately reflect the subject transactions,[1] and that the restricted stock sold in those transactions was essentially the same stock sold to SeaFin.  *See* Declaration of Jon Pevzner ("Pevzner Decl."), attached as Exhibit B, at ¶¶ 8-10.  Mr. Pevzner also testifies that with the exception of a single transaction, the sales depicted on the spreadsheet were all arm's length transactions to outsiders.[2]  *Id.* at ¶¶ 12-13.   Finally, Mr. Pevzner confirms that the average price paid for restricted shares of Connectyx was $0.005.  *Id.* at ¶ 11.

In support of its position, the government provided a declaration from Thomas Carocci, a New York-based attorney employed by FINRA.  Mr. Carocci opines that the shares purchased by

---

[1] The back-up documentation for these transactions was provided to the government and to Probation.  Because of the large number of pages, these documents are not being filed herewith. However, undersigned counsel has conferred with Probation Officer Chrissy Murphy, who agreed to provide the documents to the Court should the Court wish to examine them.

[2] The one exception was a single transaction involving a consultant (Danzig) who performed some work for Connexytx and accepted stock as payment for his $2,000 invoice.  (depicted on line 2 of the spreadsheet).

J. Rosenthal Law, P.A. ♦ 1835 NE Miami Gardens Drive #149 ♦ North Miami Beach, Florida 33179

SeaFin are virtually worthless.  Mr. Carocci's opinion essentially derives from his beliefs that the restricted nature of these shares make them almost unsaleable, that any value based on the market price of free-trading shares must be substantially discounted, or that the shares should be valued based on the trading price that existed at the end of the restriction period.

Of course, it is not a defendant's burden to disprove loss amounts; rather, the government bears the burden to prove the amount of loss by a preponderance of the evidence.  *See, e.g., United States v. Hartstein*, 500 F.3d 790, 796-97 (8th Cir. 2007) (when the defendant argues that some alleged losses were in fact legitimate investments, the government bears the burden of showing otherwise).  The Court has wide discretion in choosing how to calculate loss, reviewable only for clear error.  "Calculating the amount of loss for purposes of the sentencing guidelines is more an art than a science. . . . [A] party dissatisfied with the sentencing court's quantification of the amount of loss in a particular case must go a long way to demonstrate that the finding is clearly erroneous."  *United States v. Rostoff*, 53 F.3d 398, 407 (1st Cir. 1995) (citations omitted); *see also, United States v. Prange*, 771 F.3d 17, 35 (1st Cir. 2014) (court's calculation of amount of loss reviewed for clear error).

Mr. Carocci's opinions should be rejected and this Court should instead use the actual data summarized in Exhibit A to establish the value of the shares purchased by SeaFin.  This data is objective and reliable, as it reflects the actual prices paid by actual persons who purchased the same type of shares as did SeaFin during the relevant period.  The data is the best measure of the restricted shares at issue here, and this Court should value them at $0.005 per share, for a total value of $5,500.  This amount should be subtracted from the price paid by SeaFin ($45,000), and the amount of loss should thus be $39,500.

7

### B.      Resulting Guidelines Calculation

The correct version of the Federal Sentencing Guidelines to be used in this case is the version effective November 1, 2015.  USSG § 1B1.11, p.s. ("The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced.").   This version includes an amendment to the loss table of § 2B1.1, adopted because:

> While some of the monetary values in the Chapter Two guidelines have been revised since they were originally established in 1987, none of the tables has been specifically revised to account for inflation.  Due to inflationary changes, there has been a gradual decrease in the value of the dollar over time. As a result, monetary losses in current offenses reflect, to some degree, a lower degree of harm and culpability than did equivalent amounts when the monetary tables were established or last substantively amended.

Amendments to the Sentencing Guidelines, available at:

http://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20150430_RF_Amendments.pdf.

Schuman's total offense level is 13, calculated as follows:

| | |
|---|---|
| Base Offense Level…………………………………. | 7 (§ 2B1.1(a)(1)) |
| Amount of Loss…………………………………. | +4 (§ 2B1.1(b)(1)(C) (more than $15,000/not more than $40,000)) |
| Officer/Director of publicly traded company………… | +4 (2B1.1(b)(19)(A)(i)) |
| Acceptance of Responsibility …………………………. | -2 (§ 3E1.1(a))[3] |
| Total Offense Level …………………………………… | 13 |

---

[3]  Although the PSR gives Schuman the extra, third-level reduction for acceptance of responsibility, once the amount of loss increase is corrected from +6 to +4, he becomes ineligible for this third level because his adjusted offense level is not 16 or greater.

8

### IV.     Unique Facts Supporting A Non-Guidelines Sentence

This Court should sentence Schuman to a term of probation, and not to a guidelines sentence.  There are quite a few substantial reasons to support a non-guidelines sentence here.[4]  Courts have held that variances are not subject to the guideline analysis for departures.  *See e.g. United States v. Fumo*, 655 F.3d 288, 317 (3d Cir. 2011), as amended (Sept. 15, 2011).  In some situations, a prohibited ground for departure may be a valid basis for a variance.  *See e.g. United States v. Chase*, 560 F.3d 828 (8th Cir. 2009) (departure precedents do not bind district courts with respect to variance decisions, but may be considered "persuasive authority").  Sentencing courts should not evaluate a request for a variance "piecemeal, examining each section 3553(a) factor in isolation, but should instead consider all the relevant factors as a group and strive to construct a sentence that is minimally sufficient to achieve the broad goals of sentencing.  This inquiry should be guided by but not made unflinchingly subservient to, the concerns expressed in the statute's various sub-parts." *United States v. Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008).

Schuman urges a downward variance to probation for the following reasons:

(i)      Schuman affirmatively turned himself in to law enforcement;

(ii)     Schuman was recruited to participate in the subject transaction, and there is no evidence that he was predisposed to commit a crime;

(iii)    Schuman's actions were at all time motivated by his desire to obtain funding for Connectyx, a real company operating a legitimate business, and Schuman derived no personal financial gain from the two transactions at issue;

---

[4] Communications with counsel for the government in this matter have revealed that the government will also recommend a probationary sentence.  The government is expected to present its own arguments in support of such a sentence.

9

(iv)     In addition to the punishment to be imposed by this Court, Schuman has also been sanctioned by the SEC for the identical conduct;

(v)      Schuman's actions were atypical and out-of-character for an otherwise law abiding, upstanding member of the community;

(vi)     Schuman's wife of 32 years suffers from a debilitating heart condition and relies on Schuman as her primary caregiver.

### A.      <u>Schuman Essentially Turned Himself In to Law Enforcement</u>

The FBI sting action that ensnared Schuman was running for a while and many other corporate representatives became involved in transactions similar to those entered into by Schuman.   In late 2012 Schuman learned of a press release describing the arrest of two such persons.  Schuman recognized the description of the sting operation, and began to believe that he too had been involved in a government sting.  Although many people in his position would likely seek to minimize the possibility of arrest and prosecution, or else would simply sit back and hope they would not be caught, Schuman did not do this.   Instead, Schuman voluntarily and affirmatively contacted law enforcement agents and essentially "came in from the cold."[5]

Schuman met with law enforcement, provided a proffer and was debriefed.  Assistant United States Attorney Mark Balthazard has candidly advised undersigned that he has never had such a case, and undersigned counsel agrees that this is exceptionally rare.  As such it merits significant consideration by this Court.

---

[5] John Le Carré, The Spy Who Came In From The Cold (1963) (the phrase is used to describe someone, like a Cold-War era spy, returning from concealment or exile).

10

B.      **Schuman had no Predisposition to Break the Law**

Schuman was recruited by Barry Hawk, an attorney and investment advisor, and was presented with what was described as an opportunity to obtain private equity funding for Connectyx.   As a small company in a difficult economic environment, Connectyx faced significant challenges in raising operating funds.   When presented with the idea of the SeaFin investment Schuman agreed to participate even though doing so broke the law.   He does not retreat from accepting responsibility for his conduct, but does maintain that he was not searching for an illegal transaction but rather agreed to join in one once it was presented to him.

There is no evidence that Schuman was being investigated before his contact with Barry Hawk, and indeed, undersigned has been advised that Schuman was not under investigation prior to being brought into this deal.   The deal itself was devised by the undercover agent and presented to Schuman; Schuman did not initiate, devise, conceive of, or plan this transaction or the details thereof, he merely agreed to participate.   *Contrast United States v. Sneed*, 34 F.3d 1570, 1578 (10th Cir. 1994) ("Though the FBI initiated the contact and admitted outlined the basic plan to Sneed, he readily accepted and refined the suggested plan, adding the crucial details in order to make it work smoothly.   Sneed had a direct, active, and primary role in organizing and planning the Monarch fraud.").   Unlike the defendant in *Sneed*, Schuman did no planning or organizing of any crucial details; he had no direct, active or primary role in organizing or planning the SeaFin fraud.   He agreed to participate, and by doing so committed a crime. However, but-for Hawk's bringing this deal to him, there is no evidence that Schuman would have ever broken the law.

J. ROSENTHAL LAW, P.A. ♦ 1835 NE MIAMI GARDENS DRIVE #149 ♦ NORTH MIAMI BEACH, FLORIDA 33179

### C.    Schuman's Intent Was to Help Connectyx, Not to Seek Personal Gain

Connectyx was, and still is, a real company that conducts legitimate business.  Schuman's intent in embarking on the road that led him into the SeaFin transaction was not commit a fraud, but rather to raise funding for the company.   Jon Pevzner, Connectyx President and CEO explains in his declaration that money was needed to fund a national advertising campaign featuring Joan Lunden, former Good Morning America host.  Significantly, after meeting with John Kelly (the hedge fund manager who was really an undercover FBI agent), Schuman returned to Florida and discussed the SeaFin funding with the Board of Directors of SeaFin and with its largest investor, Dr. Barry Ginsberg.  *See* Pevzner Decl. (Exhibit B), and November 18, 2015 letter from Barry Ginsberg ("Ginsberg letter"), attached hereto as Exhibit C.  The Board gave Schuman approval to enter into the SeaFin transaction.

Dr. Ginsberg explains in detail why, as a major investor in Connectyx, he believed that the SeaFin transaction, even with the 50% payment to the hedge fund manager, was beneficial to the company.  *See* Exhibit C.  In his experience, it is not uncommon for start-up microcap companies to have to offer large share-price discounts to obtain financing, even up to 50% less than market price.  This often ultimately hurts other investors when the financiers sell those shares they had bought at a discount.  With the SeaFin deal, though, this "discount" took the form of a cash payment up-front, which would not dilute stock or negatively impact share price.  Pevzner agrees that, although Schuman broke the law, "he only had the company's best interest in mind and had no intention of personal gain."  Pevzner Decl. at ¶ 7.

In fact, Schuman did not receive any personal financial benefit from this transaction.  What's more, as part of his plea agreement he has consented to forfeiture of assets equaling

$22,500, the amount SeaFin "lost" in this transaction. That money will come from Schuman's own assets, even though he never received those funds in the first place.

The First Circuit has clearly held that a sentencing judge can place substantial weight on the conclusion that a defendant did not act to enrich himself personally. *United States v. Prosperi*, No. 06-10116-RGS, 2010 U.S. Dist. LEXIS 44953, at *7-8 (D. Mass. May 6, 2010), *aff'd* 686 F.3d 32, 50 (1st Cir. 2012) (approving non-guidelines sentence of 6 months home detention in massive, 10-year fraud involving some $5.2 million in loss, because defendants did not act to enrich themselves). Similarly here, Schuman's actions were motivated by his desire to obtain funding for Connectyx and he did not seek to, and in fact did not, receive personal financial gain. To ignore this important fact and impose a guidelines sentence nonetheless would contravene "the principle that the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011).

### D.     Schuman Has Been Sanctioned by the SEC For This Identical Conduct

After Schuman entered his guilty plea in this matter the SEC advised of its intent to initiate a civil regulatory action against him based on the same conduct at issue herein. (SEC Administrative Proceeding File No. 3-16566). Of course, having already entered his plea before this Court, Schuman was estopped from denying the essential allegations raised by the SEC. In fact, the SEC took nearly verbatim the text of the factual proffer used during Schuman's plea colloquy herein as the basis for the civil regulatory action.

Faced with this *Hobson's* choice, Schuman ultimately entered into an agreement with the SEC, which issued an order sanctioning him. A copy of the Order is attached as Exhibit D. The sanctions imposed on Schuman include a five-year ban on acting as an officer or director of any

J. Rosenthal Law, P.A. ♦ 1835 NE Miami Gardens Drive #149 ♦ North Miami Beach, Florida 33179

publicly traded company, and five-year bar from participating in any offering of a penny stock; after that five-year period Schuman would be required to re-apply to regain the ability to engage in this activity.

Although this SEC action is a separate, civil regulatory proceeding, as part of its sentencing analysis this Court should consider the fact that Schuman has already been sanctioned based on the identical conduct at issue herein.  *See, e.g., United States v. Anderson*, 533 F.3d 623 (8th Cir. 2008) (affirming a downward variance based on other ways in which the defendant had suffered atypical punishment such as the loss of his reputation and his company, the ongoing case against him from the Securities and Exchange Commission and the harm visited upon him as a result of the fact that his actions brought his wife and friend into the criminal justice system").

### E.      This Conduct is Out-of-Character For Schuman

Schuman is an upstanding and valuable member of his community who, apart from his actions in this matter, has lived a law abiding life filled with good deeds, charitable activities, and giving to others.  Many members of the community have written of his good deeds and concern for others.  A sampling of these letters is attached as Composite Exhibit E, and includes the following:

- Dr. Jonathan P. Kendall, Rabbi Emeritus of Temple Beit HaYam, who has known Schuman for almost 19 years.  He speaks of Schuman's involvement as President of the synagogue Men's Club, and member of the Board of Directors.  Rabbi Kendall writes that "[a] broken man, usually ebullient of spirit, approached me to write this letter on his behalf.  To say he is remorseful, contrite and penitent would be a minimalization of his angst, shame and his mortification."

14

- <u>Rabbi Jeffrey W. Goldwasser, former rabbi of Temple Beit HaYam</u>, who knew Schuman well during his tenure at Schuman's synagogue.  He described Schuman as an "exceptionally active member," serving on the Temple Board of Directors, President of its Early Childhood Learning Center, volunteering for its soup kitchen program to feed the hungry and less fortunate, and participating in a weekly Torah study group.  Rabbi Goldwasser characterizes Schuman as "a 'doer,' a man who took every opportunity to help others."

Rabbi Goldwasser states that, as Schuman's primary spiritual counselor, he feels he "know[s Schuman] and his heart very well."  The Rabbi observes that Schuman takes responsibility for his actions, and "regrets his actions deeply, not only for the suffering they have brought him and his family, but because he knows them to be wrong."

- <u>Christina Tucker and Joseph O'Grady, of Dream Center for Recovery</u>, where Schuman works.  They advise that Schuman informed them of his criminal activity, that he has great remorse for his actions, and they "support him 100% as [they] know he is an honorable man that made a mistake."

- <u>Dr. Karl E. Drehobl</u>, who has known Schuman for over 11 years, and has been active with him in their Temple.  Dr. Drehobl describes how Schuman "recently came to me as a contrite, ashamed and broken person, who is deeply regretful of his actions.  What struck [the doctor] most was [Schuman's] concern for how potential incarceration would have a devastating effect on his wife and family, being less concerned about the effect on himself."

- <u>Matt Rambo, CA Director for New Directions Sober Living</u>, who explains how Schuman helped him at a pivotal time in his personal life, and supported him as he has seen Schuman do with many others.

J. ROSENTHAL LAW, P.A. ♦ 1835 NE MIAMI GARDENS DRIVE #149 ♦ NORTH MIAMI BEACH, FLORIDA 33179

As these and the other included letters all indicate, Schuman is a selfless man who gives back to his community in many ways. His involvement and charitable deeds pre-date his involvement in these matters, illustrative that these traits are embedded in Schuman and are not newly-acquired evidence of good character meant solely to impress a sentencing judge.

Further, for years Schuman has provide valuable information to law enforcement about criminal and other wrongful activities he has seen in the marketplace. This includes information provided to the SEC and FINRA, some of which has been very valuable and had led to official action taken against the wrongdoers. It is expected that the government will further elucidate this point, and if appropriate/necessary, Schuman will provide further detail at his sentencing hearing.

Because Schuman has led a good, decent and otherwise law abiding life, his criminal conduct in this matter is atypical and out of character, and warrants a downward variance.

### F.     **Schuman's Wife is Seriously Ill and Relies on Schuman's Care**

Schuman's wife of 32 years, Amanda, suffers from progressive cardiovascular disease. She had her first heart attack at age 41, and since then she has had over 30 cardiac catheterizations and has required 12 stents. In 2006 she had a cardiac double bypass, but the bypass grafts failed and in late 2007 she had a triple bypass, rendering her permanently medically disabled. *See* letter from Amanda Schuman, attached as Exhibit F. Shortly thereafter, Mrs. Schuman was diagnosed with "Prinzmetal Syndrome," a rare form of variant angina; the syndrome is life-threatening, and has resulted in frequent hospitalizations (7 admissions of 7-10 days each in the past year alone), IV Nitro therapy, daily oxygen therapy and other IV cardiac medications. *Id*.

16

Because of his wife's disability and fragile medical condition, Schuman has picked up most of the household chores.  He is also his wife's primary caregiver, and when she is at her worst she relies on him for assistance with her daily functions.  Mrs. Schuman's two sisters, Tracy and Lynn Sloan, corroborate this information in their letters, attached as Composite Exhibit G.

Schuman respectfully urges this Court to spare him from incarceration, as his absence will cause undue hardship to his wife.  Family circumstances, although usually not grounds for a departure, can support a downward variance.  *See, e.g., United States v. Schroeder*, 536 F.3d 746 (7th Cir. 2008) (remanding for resentencing where the sentencing court did not address defendant's claim of extraordinary family circumstances: "[w]hen a defendant presents an argument for a lower sentence based on extraordinary family circumstances, the relevant inquiry is the effect of the defendant's absence on his family members"); *United States v. Lehmann*, 513 F.3d 805 (8th Cir. 2008) (affirming a downward variance to probation where the district court found that a prison sentence would negatively affect the defendant's disabled young son); *see also United States v. Barry Hawk*, Criminal No. 14-CR-10199 MLW, where this Court imposed a sentence of probation in part based on the effect the defendant's incarceration might have on his ill daughter.

V.   **An Alternative to Imprisonment is Legally Available and is Appropriate Here**

Probation is a viable sentencing alternative available to this Court, permitted through the requested sentencing variance.  Section 3553(a)(4) provides flexibility in sentencing by "provid[ing] alternatives to incarceration where necessary . . . ."  *United States. v. K*, 160 F.

17

Supp. 2d 421, 431 (E.D.N.Y. 2001).   Indeed, under section 3553(a)(5), the "utilization of alternatives to incarceration in appropriate cases" motivated the institution of the Guidelines and is intended to be undertaken in a manner complimentary to their policies. *Id.* at 432.   Thus, a downward variance to probation is not prohibited even when the Guidelines call for imprisonment.  *See United States v. Wadena*, 470 F.3d 735, 738 (8th Cir. 2006).

In an extremely well-reasoned opinion, The Honorable Robert T. Dawson of the Western District of Arkansas explained the realities of probation in his sentencing of Thomas M. Coughlin, former Chief Operating Officer, Executive Vice President and Vice Chairman of the Board of Directors of Wal-Mart Stores, Inc.   Mr. Coughlin was sentenced for fraudulently misappropriating funds from Wal-Mart; his guidelines sentencing range was 27-33 months imprisonment.  Judge Dawson departed and varied from that range and sentenced the defendant to probation including home detention.  He explained that:

> The Supreme Court in *Gall* agreed with United States District Judge Pratt that probation is a "substantial restriction of freedom . . ."  The *Gall* Court noted that "[p]robation is not granted out of a spirit of leniency . . . .  As the Wickersham Commission said, probation is not merely 'letting an offender off easily," and the probation or parole conditions imposed on an individual can have a significant impact on both that person and society . . . .  Often these conditions comprehensively regulate significant facets of their day-to-day lives . . . .  They may become subject to frequent searches by government officials, as well as to mandatory counseling sessions with a caseworker or psychotherapist."
>
> Judge Pratt explained that the defendant "will not be able to change or make decisions about significant circumstances in his life, such as where to live or work, which are prized liberty interests, without first seeking authorization from his Probation Officer or, perhaps, even the Court.  Of course, the Defendant always faces the harsh consequences that await if he violates the conditions of his probationary term."

18

*See* Court's Sentencing Memorandum in *United States v. Thomas M. Coughlin*, W.D. Ar. Case No. 06-20005 at pp. 17-18, a copy of which is attached hereto as Exhibit H (internal citations omitted).

Judge Dawson further explained that:

§ 3553(a) permits variance because, based on the unique factors of a particular case, austere adherence to the averages and generalities of the Guidelines can be unjust and contrary to reason. In some cases, the sentence suggested by the Guidelines is not appropriate, as one size cannot be said to fit all. No chart of numbers will ever fully contemplate, quantify and cipher the endless variations of the human experience. While it might provide a normalizing force in sentencing, we cannot, with a system of points and categories, reduce justice to a universal formula.

*Id*. at p. 23.

In this district, Judge Stearns observed in imposing sentence in *Prosperi*:

I think it is very difficult at times, for those of us who are judges or lawyers, to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime. I do not think, sometimes, we fully recognize the anguish and the penalty the burdens that people face when called to account . . . for the wrong that they have committed.

*Prosperi*, 686 F.3d at 48 (quoting Judge Stearns' sentencing order). These considerations are important in deciding what sentence for Schuman will be "sufficient, but not greater than necessary." 18 U.S.C. § 3553(a).

For the reasons set forth herein, it is respectfully suggested that a sentence of probation is adequate and warranted under these circumstances. Schuman thus requests that this Court

J. ROSENTHAL LAW, P.A. ♦ 1835 NE MIAMI GARDENS DRIVE #149 ♦ NORTH MIAMI BEACH, FLORIDA 33179

temper punishment with mercy, and impose a sentence of probation.

DATED:        November 27, 2015

Respectfully submitted,

Jonathan H. Rosenthal
Counsel for Ronald Lawrence Schuman
J. Rosenthal Law, P.A.
1835 NE Miami Gardens Drive #149
North Miami Beach, Florida 33179
Tel. 954-322-0065
Email: jrosenthal@bellsouth.net

By:      s/ Jonathan H. Rosenthal
           Jonathan H. Rosenthal
           Admitted *Pro Hac Vice*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that this document filed through the Court's ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 27th, 2015.

s/ Jonathan H. Rosenthal
Jonathan H. Rosenthal

J. ROSENTHAL LAW, P.A. ♦ 1835 NE MIAMI GARDENS DRIVE #149 ♦ NORTH MIAMI BEACH, FLORIDA 33179